AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of<br>*(Briefly describe the property to be searched)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 922(g)(1) and 924(c) | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25-sc-69<br><br>Filed Under Seal |
|---|---|---|

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the ___Jurisdiction of the___ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1), 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 18 U.S.C. § 924(c) | Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year;  Possession with intent to distribute Marijuana;  Using, carrying or possessing a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:
See Affidavit in Support of Application for Search Warrant, which is incorporated herein.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jason Wheeler, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: ___01/17/2025___

_____
*Judge's signature*

City and state: ___Washington, D.C.___

G. Michael Harvey, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY ONE<br>PROVIDER PURSUANT TO 18 U.S.C. § 2703 FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§<br>922(g)(1) and 924(c) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  25-sc-69

Filed Under Seal

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Jurisdiction of the     District of     Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before     January 31, 2025     *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     G. Michael Harvey     .

*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for ____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of     _____     .

Date and time issued:     01/17/2025     _____
                                                        *Judge's signature*

City and state:     Washington, D.C.     G. Michael Harvey, United States Magistrate Judge
                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  25-sc-69 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      This warrant applies to information associated with iCloud account and Apple ID, wlamaas@gmail.com (the "TARGET ACCOUNT"), that is stored at premises owned, maintained, controlled, or operated by Apple Inc. ("PROVIDER"), a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

### Particular Things to Be Seized

**I.     Information to be Disclosed by Apple Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple Inc. ("Apple"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple. Apple is required to disclose the following information to the government, in unencrypted form whenever available, for the account described in Attachment A:

a.     All records or other information regarding the identification of the TARGET ACCOUNT, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the accounts were created, the length of service, the IP address used to register the accounts, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the TARGET ACCOUNT (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network

2

Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      For data backed up to iCloud from May 1, 2023 through PRESENT, The contents of all emails associated with the accounts including stored or preserved copies of emails sent to and from the accounts (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      For data backed up to iCloud from May 1, 2023 through PRESENT, the contents of all instant messages associated with the accounts, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      For data backed up to iCloud before PRESENT, the contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      For data backed up to iCloud before PRESENT, all activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers),

3

including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      For data backed up to iCloud before PRESENT, all records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant. Records can be sent to:

**Federal Bureau of Investigation**
**Special Agent Jason Wheeler**
**601 4ᵗʰ Street NW, Washington, D.C. 20535**
**Jkwheeler@fbi.gov**

## II.      Information to be Seized by the Government

All information uploaded to the TARGET ACCOUNT between May 1, 2023 and PRESENT described above in Section I that constitutes fruits, contraband, evidence,

instrumentalities, and information relating to violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (possession with intent to distribute Marijuana), and 18 U.S.C. § 924(c) (using, carrying or possessing a firearm in furtherance of a drug trafficking crime) (collectively, the "TARGET OFFENSES"), that have been committed by LAMAAS LOWERY-BEY (the "SUBJECT") and other identified and unidentified persons, as described in the affidavit submitted in support of this warrant, including, for the account described in Attachment A, information including any stored electronic data, that contains, constitutes evidence of, documents, establishes, identifies, or reflects:

A.   the identity of the person(s) who created or used, and continue to use, the account, including records that help reveal the whereabouts of such person(s);

B.   how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the account user;

C.   the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the TARGET OFFENSES; or (ii) communicated with the account about matters relating to the TARGET OFFENSES, including the contents of their communications and records that help reveal their whereabouts;

D.   the SUBJECT's state of mind (*e.g.*, intent, absence of mistake) or preparation, planning, knowledge, and experience, related to the TARGET OFFENSES;

E.   the commission of the TARGET OFFENSES;

F.   locations where the SUBJECT committed the TARGET OFFENSES, and traveled to before and after the commission of the TARGET OFFENSES, including in preparation for the TARGET OFFENSES;

G.   meetings and communications between the SUBJECT and other individuals discussing the commission of the TARGET OFFENSES;

H.   the SUBJECT access to, purchase of, sale of, possession of, or relationship with, firearms;

I.    the obtaining, secreting, transfer, expenditure, and/or the concealment of firearms;

J.    evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of the TARGET OFFENSES; and

K.    evidence of the purchase of items from the assets derived from the commission of a narcotics trafficking offense in violation of the TARGET OFFENSES.

L.    information relating to stash houses, firearms, purchasers and suppliers of drugs;

M.    information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES; and

N.    photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include photographs of illegal drugs and/or firearms;

O.    Evidence of use of applications used in furtherance of the TARGET OFFENSES (including WhatsApp, Jabber, Telegram, TextNow, or other applications);

P.    Any records pertaining to the means and source of payment for devices (including any credit card or bank account number or digital money transfer account information).

### III.    Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by Apple and determine which information is within the scope of the information to be seized specified above in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information provided by Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO** <u>**FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Apple Inc. ("Apple"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Apple. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Apple, and they were made by Apple as a regular practice; and

b.       such records were generated by Apple's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Apple in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by Apple, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                                  Signature

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 922(g)(1) and 924(c)** | SC No. 25-sc-69  **Filed Under Seal** |

*Reference:*      *USAO Ref. 2024R00538; Subject Account: wlamaas@gmail.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, JASON WHEELER, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one iCloud account used by Lamaas LOWERY-BEY (hereinafter "LOWERY-BEY") associated with email **wlamaas@gmail.com** (the "TARGET ACOUNT"), which is stored at premises controlled by Apple, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at One Apple Park Way, Cupertino, CA. The information to be searched is described in the following paragraphs and in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review

that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.     I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am a Special Agent with the FBI, duly appointed according to law and acting as such. I have been a Special Agent with the FBI since approximately 2018. Before joining the FBI, I served as a Customs and Border Protection Officer with the United States Department of Homeland Security, United States Customs and Border Protection, for approximately three years, between in or about 2015 and in or about 2018. During my tenure with the FBI, I have participated in numerous investigations of organized crime, including organized crime families collectively known as "La Cosa Nostra" or "LCN" as well as violent gangs or "crews", during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations of those engaged in criminal activities, (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors, and (f) reviewed and analyzed geolocation data based on prospective cell site and historical cell site records. As a result of my training and experience, I am familiar with the techniques and methods used by individuals involved in criminal activity to conceal their activity from law enforcement and with the activities of members and

associates of La Cosa Nostra and violent gangs and the way in which its members and associates react to individuals who cooperate with the government against them.

4.     I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.

5.     Through my training and experience, I have become familiar with the methods and techniques associated with the distribution of various narcotics, including cocaine, cocaine base (also "crack or "crack cocaine"), heroin, fentanyl (and other various opioids), methamphetamines, phencyclidine ("PCP"), marijuana, ketamine, and other drugs. Through my training and experience, I have also gained familiarity with the organization and operation of drug conspiracies, including their methods of manufacturing, concealing, transporting and distributing various narcotics including the above-noted substances. I am also familiar with the sort of support and assistance narcotics organization require to conduct their illegal activities. Through my experience, I am also aware that narcotics traffickers possess firearms to assist them in the trafficking of narcotics. Firearms are used by drug traffickers for protection and intimidation, and they are maintained in secure places, such as, residences, stash houses, and vehicles. In addition, drug traffickers travel with their firearms when outside their residences.

6.     Based upon your affiant's knowledge and experience, as well as the knowledge and experience of other investigators and law enforcement officers with whom your affiant has worked alongside, your affiant has learned the following:

(a)     Persons who illegally possess firearms and/or engage in narcotics trafficking usually keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds, and storage lockers.  Persons who illegally possess firearms and/or narcotics intended for distribution frequently utilize stash houses and oftentimes still have contraband or evidence of those crimes within their residences.  In addition, for individuals and drug trafficking organizations (DTO) involved in the distribution and possession with intent to distribute opioid pills, including fentanyl pills, marijuana, crack cocaine, powder cocaine, or heroin, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade.  For example, small and large plastic baggies are the packaging material of choice for many narcotics traffickers; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into crack cocaine, or to mix and dilute heroin and transport it discreetly thereafter.

(b)     It is also common for narcotics traffickers to store narcotics, paraphernalia, and associated items at, and/or distribute from, specific locations other than their own residences, to include stash houses, the residences of family members and associates, and other locations where trusted associates of the trafficker are allowed access in order to

protect the cache of drugs, as well as the drug proceeds derived from the sale of these drugs. Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs.

(c)     Narcotics traffickers often use and retain firearms and other weapons to protect themselves as well as to secure their cache of narcotics.  Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers for such items.

(d)     Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase.  These records may be in written or electronic form.  Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the importation, manufacture, transportation, ordering, sale and distribution of controlled substances, and contact information for associates and co-conspirators in the narcotics trade.  This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identifications, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.  These items are generally maintained and retained for long periods of time in the drug traffickers' residences, vehicles, or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with

which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, handheld computers, digital hard drives, including but not limited to, iPads and external storage drives; and the media to store information, such as data storage devices.

(e)    Individuals involved in narcotics trafficking often conceal within their residences; the residences of family members, friends and associates; the places of operation of the drug distribution activity such as stash houses or safe houses; or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative, or associate, in an effort to safeguard and conceal such proceeds of their drug trafficking.

(f)    Individuals who deal in illegal narcotics often take photographs of themselves, their associates, their property and illegal contraband. These photos are usually maintained in their residence or vehicles or in the residences of their friends, family or associates, in their business locations, or in the places of operation of their drug distribution activity, such as a stash house or safe house.

7.    As set forth above, based on my training, experience and involvement in the investigation, I know that members and associates of narcotics networks, particularly those

engaged in narcotics trafficking, commonly use cellphones, smartphones, other personal handheld electronic devices, and laptop and desktop computers and external storage devices to communicate with, among others, their criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their illegal activities as well as the existence of the enterprise under investigation and the relationship among the co-conspirators.   Moreover, criminals often maintain multiple cellphones to communicate with other criminals about their illicit activity.

8.    Based on my training, experience, and involvement in the investigation, I have learned that illegally participating in the affairs of a narcotics trafficker, especially through sales of narcotics, is generally a continuing and ongoing offense. Because participating in this form of illegal activity is often a profitable business, individuals who successfully engage in these crimes generally continue to do so until they are arrested or otherwise compelled to stop.

9.    Based upon my training and experience and consultation with other law enforcement agents, I know that targets of narcotics investigations will often alternate the use of multiple vehicles in order to avoid detection by law enforcement's surveillance efforts.  I also understand based upon my training and experience and consultation with other law enforcement agents that those individuals will also use multiple locations, sometimes referred to as "stash houses," to secure the proceeds as well as to secure narcotics and narcotics manufacturing supplies in order to avoid potential seizure if discovered by law enforcement.  I further understand those targets of criminal narcotics investigations use electronic means of communication including computers and smartphones to communicate with co-conspirators as well as customers.

10.    Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet &

Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.  See Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

11.     In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.

12.     As outlined above, the individuals involved in narcotics sales have utilized cellphones to coordinate and execute the TARGET OFFENSES.  Based on my training and experience, I know that individuals who engage in narcotics manufacturing and trafficking commonly use computers and smart cellphones to communicate with co-conspirators online; keep track of co-conspirator's contact information; and/or keep a record of illegal transactions or criminal proceeds for future reference.  As a result, they often store data on their computers and smart cellphones related to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; and/or records of illegal transactions or the disposition of criminal proceeds.

13.     Based on my training and experience, I also know that some individuals who participate in TARGET OFFENSES have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications.  By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

14.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year) and 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (possession with intent to distribute marijuana); and 18 U.S.C. §924(c) (using, carrying or possessing a firearm in furtherance of a drug trafficking crime) (collectively, the "TARGET OFFENSES") have been committed, are being committed, and/or will be committed by LAMAAS LOWERY-BEY. There is also probable cause to search the information described in Attachment A for evidence of these crimes, instrumentalities, and contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

15.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## RESUBMISSION OF PREVIOUSLY AUTHORIZED SEARCH WARRANT 24-SC-2347

On November 22, 2024, United States Magistrate Judge G. Michael Harvey signed and issued search warrant 24-sc-2347 for the TARGET ACCOUNT associated with LOWERY-BEY. On November 22, 2024, your affiant inadvertently served the iCloud warrant on Block, Inc. instead of Apple, Inc.  On December 26, 2024[1], Block, Inc. notified your affiant that the warrant was executed erroneously on the wrong provider.  Because the original warrant's execution period

---

[1] Your affiant was on holiday leave during this time period and only recently discovered Block's response.

expired on December 6, 2024 (14 days after the date of issuance), your affiant is reapplying for the same iCloud warrant for TARGET ACCOUNT associated with LOWERY-BEY.

**PROBABLE CAUSE**

16.     From on or about March 2024, the FBI Washington Field Office ("FBI WFO") Safe Streets Task Force began investigating LOWERY-BEY and other identified and unidentified persons, for their involvement regarding the TARGET OFFENSES in and around the area of the 1900 block of 18th Street Southeast, in Washington, DC., specifically: 1907 18th Street Southeast, a known area in which the 18th and T Crew operates in, which is based on witness interviews conducted by the Metropolitan Police Department, and interactions on numerous occasions by law enforcement familiar with the area.

17.     The 18th and T Crew is a neighborhood-based gang that operates within Washington, D.C., specifically Southeast, MPD Sixth District, PSA 607, more commonly known as the Fairlawn Neighborhood. This neighborhood-based gang primarily operates on the 1900 Block of 18th Street SE, which intersects with T Street SE. Based on MPD data and Census Tract 007601, which covers the Fairlawn Neighborhood, the highest number of violent crimes with a gun, 36, occurred during the summer of 2023 within PSA 607.  The 18th and T Crew is an ongoing neighborhood-based gang, whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

18.     These neighborhood-based gangs, which are referred to as "crews" or "clicks" consist of known members or associates that congregate in a geographical location. This location is how they are commonly referred to as by witness accounts, law enforcement tracking, and referred to as by other rival gangs or crews.  While the crew may not necessarily have a

designated tag, name, or symbol, their various criminal activities originate from a singular geographical location for which they are primarily known as.

### *Illegal Firearms Possession and Distribution of Narcotics by LOWERY-BEY*

19.     On June 17, 2023, Metropolitan Police Department (MPD) officers observed LOWERY-BEY and several other individuals sitting outside on the sidewalk of 1900 block of 18th Street SE, Washington, D.C.  They discovered several bags of distributable amounts of suspected marijuana hanging on the fence behind where the group was sitting.  Officers then noticed a plastic bag hanging from the arm rest of the chair the Defendant was sitting in that contained a 50-round drum magazine.  The Defendant began to hunch over as if to conceal something in his waistband.  Officers recovered a 9mm Taurus Millennium handgun with 18 rounds in an extended magazine and one round in the chamber.  LOWERY-BEY was arrested for unlawful possession of a firearm and carrying a pistol without a license, but the case was later dismissed.



20.    On October 4, 2023, MPD executed a Superior Court of the District of Columbia Search Warrant[2] at 2440 Wagner Street SE, Apt D, Washington D.C. (the known residence of LOWERY-BEY), based on a surveillance camera observation of LOWERY-BEY with a handgun outside of 1911 18th Street SE a few weeks earlier. During the execution of this search warrant, MPD recovered a .40 caliber Glock handgun with an extended magazine which matched the description of the gun LOWERY-BEY was previously observed with (FIGURE-1). MPD seized the firearm and recovered DNA samples from the firearm. On or about December 23, 2023, MPD executed a Superior Court of the District of Columbia Search Warrant[3] for the body of LOWERY-BEY to include DNA.  On July 10, 2024, the DNA lab issued a report that found that the swabs from the recovered firearm is approximately 1.5 quadrillion times more probable if the sample originated from LOWERY-BEY and one unknown person than if it originated from two unknown persons.



FIGURE-1

---

[2] Superior Court of the District of Columbia Search Warrant 2023cswsld003460 authorizing a search of 2440 Wagner St. SE, Apt. D, Washington, D.C. was signed on September 25, 2023.

[3] Superior Court of the District of Columbia Search Warrant 2023cswsld4651 authorizing a search of the body of Lamaas LOWERY-BEY to include DNA Buccal swabs was signed on December 13, 2023.

21.     LOWERY-BEY has previously been convicted of a felony offense punishable by imprisonment for a term exceeding one year.  Specifically, LOWERY-BEY was convicted of Attempted Assault with a Dangerous Weapon and Unlawful Possession of a Firearm in 2020 in D.C. Superior Court Case No 2019 FD3 010329.  He received a sentence of 17 months for each count, to run concurrently.

22.     Your affiant knows that there are no firearm or ammunition manufacturers located within the District of Columbia, therefore the firearm and the ammunition traveled through interstate commerce prior to LOWERY-BEY possessing them.

23.     On or about May 21, 2024, law enforcement installed an exterior pole camera, with a view of the front entrance to 1907 18th Street SE, and an interior camera that has as view of the stairwell leading up to Apartment 8 and Apartment 10. Further review of the footage shows that LOWERY-BEY is involved in the TARGET OFFENSES from on or about May 21, 2024, through present day.

24.     On or about May 24, 2024, LOWERY-BEY is observed on the interior camera walking up the stairs and pausing on the landing outside Apartment 8. Michael CARTER, another known member of this crew, exited Apartment 8 and stepped onto the landing so that LOWERY-BEY is positioned between him and the camera. Michael CARTER appears to reach into his waistband and hand something to LOWERY-BEY. LOWERY-BEY then turns towards the camera while appearing to place a handgun in his front waistband. Both individuals then walk down the stairs.

25.     On or about May 26, 2024, law enforcement searched a vacant unit, Apartment

B4, in 1907 18th Street SE.  The searched recovered three firearms[4], a cell phone that belonged to LOWERY-BEY[5], and multiple large bags of marijuana weighing 1.6 pounds (FIGURE-2)



FIGURE-2

26.     Based on rental records obtained on June 4, 2024, show that at the time of the search of Apartment B-4, there was no legal tenant or lease agreement for the apartment.

---

[4] One of the Glock Pistols, Serial No. NNY800 chambered in 9mm, had one round in the chamber, and 25 rounds of 9mm ammunition in the magazine, was equipped with a giggle switch, and extended magazine.  Based on my law enforcement training and experience, the giggle switch allows a pistol to be capable of automatic fire.

[5] On July 8, 2024, United States Magistrate Judge Moxila A. Upadhyaya issued search warrant 24-sw-220 for the cell phone recovered from the vacant unit.  A forensic extraction revealed that the phone belonged to LOWERY-BEY.

27.     On June 14, 2024, during the arrest of Javon GRAVES, another known associate of the above-mentioned crew, GRAVES indicated that the marijuana recovered from the vacant unit on May 26, 2024, belonged to LOWERY-BEY.

28.     From on or about May 2024 till present day, LOWERY-BEY has been observed on recording in the vicinity of 1907 18th Street SE conducting, based on my law enforcement training and experience, brief hand to hand interactions with multiple individuals consistent with the distribution and sale of narcotics.

29.     On November 7, 2024, LOWERY-BEY was indicted by a federal Grand Jury for one count of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year).  On or about November 8, 2024, law enforcement executed a search warrant authorized by the United States District Court for The District of Columbia, Case No. 24-sw-348, and arrest warrant authorized by the aforementioned court, Case No. 24-cr-00502, for the arrest of LOWERY-BEY and search of his residence.

30.     Pursuant to the aforementioned search warrant, law enforcement seized three cellular devices.  One of the devices seized, an Apple iPhone, which LOWERY-BEY verbally acknowledged to be his.  The device had an Apple ID of "WLAMAAS@GMAIL.COM", with a most recent iCloud backup of November 07, 2024. A review of the extraction showed that the device had a message retention date of "Forever". Further review of the device showed evidence of firearms possession where LOWERY-BEY can be seen holding a Glock pistol with extended magazine and narcotics trafficking where a green leafy substance, believed to be marijuana, is being weighed. (See FIGURE-3). Of note, the sneakers in the photograph with the green leafy substance can be seen being worn by LOWERY-BEY on multiple photos on the device. Based on

my law enforcement training and experience, LOWERY-BEY's iCloud backup of messages, photographs, and videos would yield further evidence of the TARGET OFFENSES. Although LOWERY-BEY has a pending case, the government continues to investigate LOWERY-BEY and identified and unidentified co-conspirators for violations of the TARGET OFFENSES.



FIGURE-3

## **BACKGROUND CONCERNING APPLE**[6]

31.     Apple is a United States company that produces the iPhone, iPad, and that previously produced the iPod Touch, all of which use the iOS operating system. Apple also produce desktop and laptop computers that use the Mac OS operating system.

---

[6]      The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

32.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

    a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

    c.  iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.

iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.  Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.  App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

33.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

34.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

35.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud,

Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

36.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

37.    Apple provides users with five (5) gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and

web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

38.     Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved. This may involve working out details of and preparing to carry out a premeditated crime, working together to cover up the crime afterwards, or simply arranging to meet up someplace where an unplanned crime would later occur. Either way, I know from training and experience that messages typically stored in iPhones and backed up to the cloud are often used for this purpose and that an iCloud account used by a participant in such criminal activity often contains evidence of communication among accomplices. For instance, communication logs indicate who the account user was communicating with both immediately before and after the crime. Similarly, your affiant has seen multiple examples of suspects communicating after a crime via text (or other online chat functions) to discuss where incriminating items have been hidden, where and what the police are doing to investigate the crime, and whether any witnesses have implicated them.

39.     Based on my training and experience, I know that people who commit crime in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (*e.g.*, GPS data), app usage information (*e.g.*, Internet search inquiries), and images

or video recordings relevant to the criminal activity.  Specifically, law enforcement has repeatedly seen videos or photos on a suspect's phone taken at or near key points in the crime.  Such video and image files often include identifying landmarks, buildings, or backgrounds that help place the suspect at an important location related to the crime or have even exculpated the individual by placing the individual at a different location at the time of the crime.  Such videos or selfies that were taken at or near the time of the crime inculpate or exculpate the suspect by identifying the phone user's precise location at the time the photo or video was taken.  Similarly, such videos and photos often have geotags, or GPS data embedded in the file, enabling law enforcement to identify the precise location where the photo was taken.  Similarly, law enforcement has found evidence of suspects searching for directions to a relevant location by using Google maps or using applications like Waze to avoid traffic.  Other phones record the directions and GPS information provided to the phone user when travelling from one location to another.  Furthermore, I know from training and experience that text messages and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.  For example, just as people making plans often update each other via text regarding when they will arrive somewhere or where they will meet, suspects often text with co-conspirators, friends, or other confidants regarding where they are going or when they plan on arriving to a location.  As such, evidence of the Account Users' location is likely to be found on records in their iCloud accounts.  For instance the photograph prior reference in para 30 and FIGURE-3 contained meta data, which contained geolocation along with longitude and latitude for there the video was recorded.

40.     Based on my training and experience, I know that people who possess firearms (as well as drugs, unlawfully obtained money, and other contraband) like to take pictures of

themselves with firearms to prove ownership or possession to their friends—sometimes called

"trophy photos." They will use a camera, cell phone with a camera, tablets with a camera and or

personal computers to photograph and store photograph of firearms or themselves holding the

firearm and other criminal activity that they may be involved in. They also often share these

images or video recordings with associates using text messaging or other forms of communication

on their cell phone such as chat features or video and photo sharing on online social networking

services, such as Instagram. These photographs, videos, and electronic communications are

excellent evidence of illegal gun possession. Moreover, cell phone apps such as Instagram can be

used for communications relating to the acquisition of firearms by those who cannot possess

firearms legally, including the transmission of photographs of firearms available for purchase, with

accompanying price information. To the extent such photos and related communications about

the sale of the item occurred using an iPhone, they would be retained and stored on iCloud. Indeed,

in this case, SUBJECT used his phone to take pictures of suspected controlled substances, and

firearms. As set forth above, your affiant has identified numerous photographs and videos on the

his phone showing that he was engaged in the unlawful possession of firearms and controlled

substances, supporting your affiant's belief that similar evidence will be found on the associated

iCloud account.

   41. Your Affiant knows that iCloud accounts can be used across multiple devices. If

SUBJECT logged into the TARGET ACCOUNT from a new iPhone or electronic device, data

uploaded to the account could provide additional evidence pertaining to the TARGET OFFENSES.

   42. Based on my training and experience in this context, I believe that the computers

of Apple are likely to contain user-generated content such as stored electronic communications

(including retrieved and unretrieved messages for Apple's subscribers), as well as Apple-generated

information about its subscribers and their use of Apple's services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Apple with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

43.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45.     Based on my training and experience, I know that suspects often delete incriminating items (such as photos, videos, texts, internet searches, and other communications)

after committing a crime or learning that the police have developed leads. This evidence is often highly relevant evidence, as it tends to be particularly incriminating. For example, your affiant is aware of suspects deleting incriminating searches for news about the crime, texts or messages with coconspirators planning crimes, and texts or messages confessing to the crime. The very fact that the items are deleted make them much more likely to be probative in the investigation.

46.     As explained above, information stored in connection with the Apple account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.

## METHODS TO BE USED TO ANALYZE DATA PROVIDED BY APPLE INC.

47.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices and electronic backups of digital devices, I know that:

a.     Searching electronic backups of digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records, and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain

specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.

48.    Moreover, numerous types of user information and metadata stored on a backup of a digital device are not susceptible to "word searches" or other narrowly targeted search techniques, including but not limited to images, audio and video recordings, and proximate GPS locations.  Likewise, the complex interrelatedness of data may undermine the efficacy of narrow search techniques based on the type, location, or date of information.  Indeed, the vast array of information that can be stored in an Icloud account can make it nearly impossible to determine the precise form and organization of user information and metadata prior to conducting a search. Finally, criminals can mislabel, misspell, or hide information; encode communications to avoid using key words; attempt to delete information to evade detection; or take other steps designed to frustrate law enforcement searches for information.

a.  For example, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

b.  Analyzing the contents of electronic backups of digital devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools

and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

c.      Based on all of the foregoing, I respectfully submit that searching any electronic backups of digital devices for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

d. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1. The analysis of the contents of the backup of digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

2. In searching the backup of digital devices and information stored on the iCloud account, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or

encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

49.     If a customer elects to backup their device using their iCloud account, Apple will store the encrypted backups. Depending on the user settings, Apple has the ability to un-encrypt the iCloud backup data. However, Apple is unable to apply a starting date filter to these datasets and provides the requested dataset either up to the end date listed in the legal process or if one is not provided, the date the legal process is executed. Apple can however use an end date to filter a request and provide all iCloud backup data in existence up to a specific end date. As such, your affiant cannot ask Apple to limit the starting timeframe for this requested data.

## CONCLUSION

50.     I submit that this affidavit supports probable cause for a warrant to search the items in Attachment A for the things described in Attachment B.

51.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution of

the requested warrant at any time in the day or night.

Respectfully submitted,

Jason Wheeler
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on January 17, 2025.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE